FILED
SEP 3 2003
CLERK, U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY_____ Deputy Clerk

# FOR PUBLICATION

ENTERED
SEP - 3 2003
CLERK, U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY_____ Deputy Clerk

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re: ) | Case No. LA 02-30769 SB |
| ) | |
| **J. HOWARD MARSHALL** ) | |
|     **et ux.** ) | CHAPTER 11 |
| ) | |
|     Debtors. ) | |
| ) | **AMENDED OPINION ON** |
| ) | **PLAN CONFIRMATION** |
| ) | **AND MOTION TO DISMISS** |
| ) | **(CONSTITUTIONAL ISSUES)** |
| ) | |
| ) | DATE:    May 23, 2003 |
| ) | TIME:    10:00 A.M. |
| ) | CTRM.:  1575 (Roybal) |

1

*196 deb*

## I. Introduction

In this case Pierce Marshall, as trustee for three family trusts (collectively referred to as "Pierce") opposes confirmation of the chapter 11[1] plan proposed by the debtors, who are his brother J. Howard Marshall, III ("Howard") and Howard's wife Ilene O. Marshall. Pierce also moves to dismiss the case. Pierce supports both of these positions on the argument that this case falls outside the constitutional bankruptcy jurisdiction of the federal courts because the debtors are solvent under a balance sheet test. Notably, Pierce has declined to file a claim on behalf of the trusts (or on his own behalf) in this case.

The court holds that the exercise of federal jurisdiction under the Bankruptcy Clause of the United States Constitution does not require that a debtor be insolvent, and that the debtors in this case may constitutionally invoke remedies provided under the Bankruptcy Code.

## II. Relevant Facts

The relevant facts in this case are set forth in the court's recently issued opinion on the non-constitutional issues involved in the pending plan confirmation and motion to dismiss. *See In re Marshall,* __ B.R. __ (Bankr. C.D. Cal. 2003). The filing of this bankruptcy case was precipitated in part by a judgment in favor of Pierce and against Howard in the Texas probate case of their father J. Howard Marshall II ("J. Howard"). The judgment, which was then on appeal, was for $11 million plus costs and interest at ten percent. By the filing date of the bankruptcy petition, this debt totaled more than $12 million.

As amended, the debtors' schedules show assets worth $13,138,311.38 and liquidated debts of $13,914,112.39. In addition to the valued assets, the schedules disclose interests in a revocable family trust, claims made in the probate estate of Howard's father J. Howard, and an interest in the Eleanor P. Stevens Irrevocable Gift Trust (which is described in detail in a full-page exhibit). In addition to the quantified debts, the schedules list nonpriority debts in unknown amounts owing to Wells Fargo Bank Texas, the City of Pasadena, a Dallas law firm and the Marshall Museum & Trust.

In addition to the $12 million judgment, Howard had been named as a defendant in a $5 million lawsuit in Louisiana. Furthermore, Pierce's lawyer also sent a letter to Howard's lawyer on May 20, 2002 providing substantial detail for another claim against Howard exceeding $100 million.

The court set a claims bar date of November 15, 2002. Pierce declined to file a proof of claim in this case. Pierce has moved to dismiss this case and has objected to the confirmation of the debtors' chapter 11 plan as amended.

Pierce makes both statutory and constitutional objections to the confirmation of the chapter 11 plan proposed by debtors Howard and Ilene Marshall. The court has previously found that the statutory requirements for confirmation are satisfied, and that the case should not be dismissed on good faith grounds. *See Marshall, supra.*

## III. Constitutionality of a Chapter 11 Case for a Solvent Debtor

Pierce contends that the debtors' assets exceed their liabilities as of the date of filing, and that in consequence they were solvent under a balance sheet test. The court finds that determining the accuracy of this contention would be very difficult and very time consuming in this case. While for some purposes in bankruptcy it is necessary to make such a determination,[2] in this case no such determination is necessary. For the purposes of the constitutional analysis, the court assumes without deciding that the debtors were solvent, in the balance sheet sense, when they filed this case.

As a statutory matter, it is clear that the bankruptcy law does not require that a bankruptcy debtor be insolvent, either in the balance sheet sense (more liabilities than assets) or in the liquidity sense (unable to pay the debtor's debts as they come due), to file a chapter 11 case or proceed to the confirmation of a plan of reorganization. The Ninth Circuit firmly rejected such a view in *Sylmar Plaza,* where it held, "insolvency is not a prerequisite to a finding of

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330 (West 2003) and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036.

[2] *See* § 546(c) (reclamation), § 547(b)(3) (preferential transfer); § 548(a)(1)(B)(ii)(I) (certain fraudulent transfers); § 553(a) (setoff).

2

good faith under § 1129(a)." *Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1074-75 (9th Cir. 2002); *accord, In re James Wilson Associates*, 965 F.2d 160, 170 (7th Cir. 1992) (rejecting bad faith challenge to confirmation).

Pierce does not contest that insolvency is not a statutory requirement for filing a voluntary bankruptcy case under chapter 11. Instead, he argues that the Bankruptcy Clause of the United States Constitution can only be invoked by a bankruptcy debtor who is insolvent under a balance sheet test. Pierce argues that the constitutional grant of authority to Congress to enact "uniform Laws on the subject of Bankruptcies throughout the United States"[3] is limited to regulating the affairs of debtors who are insolvent in this sense.

Pierce argues that there must be some content to the Bankruptcy Clause in the Constitution. In general terms, this court agrees. On this point Pierce is on solid ground. Congress is not free to define the contours of bankruptcy without any limitations: the bankruptcy terrain clearly must have some boundaries. *See, e.g., Continental Illinois Nat'l Bank & Trust. v. Chicago, Rock Island & Pac. Ry. Co.*, 294 U.S. 648, 669-70, 55 S.Ct. 595 (1935).

The test, according to Pierce, is that the Constitution must require that a debtor in a bankruptcy case be insolvent under a balance sheet test. Insofar as the Bankruptcy Code permits a debtor to file a bankruptcy case who is balance sheet solvent, according to Pierce, the law falls outside the powers granted by the Constitution to the federal government. In such a circumstance, the Constitution, and not the law, must govern the case. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803) ("If then . . . the constitution is superior to any ordinary act of the legislature; the constitution, and not such ordinary act, must govern the case to which they both apply.")

The court finds that neither balance sheet insolvency nor liquidity insolvency is required for the constitutional invocation of federal bankruptcy jurisdiction. The limits on the application of the Bankruptcy Clause lie elsewhere, not in balance sheet insolvency.

As a preliminary matter, it is necessary to distinguish the exercise of powers under the Bankruptcy Clause from the exercise of congressional powers under the Commerce Clause. These two powers are closely related. *See Railway Labor Executives' Ass'n v. Gibbons*, 455 U.S. 457, 465-66, 102 S.Ct. 1169 (1982). However, the conditions for invoking the Commerce Clause are different from those for invoking the Bankruptcy Clause, and each has its own limitations. As the Supreme Court has explained, "[u]nlike the Commerce Clause, the Bankruptcy Clause itself contains an affirmative limitation or restriction upon Congress' power," and "if we were to hold that Congress had the power to enact nonuniform bankruptcy laws pursuant to the Commerce Clause, we would eradicate from the Constitution a limitation on the power of Congress to enact bankruptcy laws." *Id.* at 468-69.

Setting aside the Commerce Clause, the powers granted to Congress under the Bankruptcy Clause are expanded by art. 1, § 8, cl. 18, which grants Congress the power "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers . . . ." *See Wright v. Union Central Life Ins. Co.*, 304 U.S. 502, 513, 58 S.Ct. 1025 (1938). Theoretically, this provision might be invoked to support the use of the Bankruptcy Clause in doubtful cases. However, the Supreme Court has never in fact utilized this approach to determine the constitutionality of bankruptcy provisions.

The court assumes without deciding that Congress was not exercising its Commerce Clause or its Necessary and Proper Clause powers in determining the qualifications for filing a bankruptcy case. Thus the court's constitutional analysis in this case is confined to the Bankruptcy Clause.

To analyze Pierce's argument, we examine the understanding of the framers of the Constitution at the time of its adoption, the history of bankruptcy law in the United States and its predecessor English statutes, and applicable Supreme Court case law. We also examine Pierce's argument that, insofar as the Bankruptcy Code permits a solvent chapter 11 debtor to file a case and proceed to plan confirmation, Congress has exceeded its Bankruptcy Powers and has deprived him of property without due process of law.

### A. Definition of Insolvency

Before undertaking this analysis, we must first address what Pierce means by "insolvency," because this term has two commonly used

---

[3] U.S. Const., Art. 1, §8[4].

3

definitions in the bankruptcy context.

For the purposes of this argument, Pierce urges the court to adopt the balance sheet definition of solvency in § 101(32)(A), which states in relevant part:

> "insolvent" means . . . with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of –
>
> (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and
>
> (ii) property that may be exempted from property of the estate . . . .

Section 101(32)(A) states the Bankruptcy Code version of the balance sheet test for insolvency. Under the non-bankruptcy version, a debtor is insolvent where its liabilities exceed its assets as shown on its balance sheet. *See* BLACK'S LAW DICTIONARY 799 (7th ed. 1999).

Section 101(32)(A) makes two modifications to the usual balance sheet insolvency test. First, the test requires the revision of balance sheet values to their "fair valuation." In contrast, a balance sheet prepared according to generally accepted accounting principles provides asset values at historical cost less any applicable depreciation or amortization. The "fair valuation" standard requires an adjustment in balance sheet values from historical cost to present market values. Second, the § 101(32)(A) definition excludes property that would otherwise appear on a balance sheet, but that is exempt under § 522 (providing exemptions for individual debtors).

The insolvency definition in § 101(32)(A) is designed to govern the handful of technical uses of this term in the Bankruptcy Code. In fact, "insolvent" is used only ten times in the entire statute, and in nine of those it is used to define narrowly drawn rights under particular statutory provisions. *See* § 365 (trustee may assume an executory contract notwithstanding a default relating to the debtor's insolvency); § 525 (protecting a debtor against discriminatory treatment during prepetition insolvency); § 541 (forfeiture based on insolvency does not prevent prepetition property from becoming property of the estate); § 543 (court may consider interests of equity holders of solvent debtor in determining whether to require a custodian to turn over property); § 545 (protecting a debtor from statutory liens predicated upon insolvency); § 546 (authorizing certain reclamation rights to creditors who have delivered certain goods to a debtor while insolvent before the bankruptcy petition was filed); § 547 (element of cause of action for preferential transfer); § 548 (element of certain causes of action for fraudulent transfers); § 553 (condition for prohibiting a creditor setoff). None of these uses sheds any light on the constitutional limits of the Bankruptcy Clause.

The final use of "insolvency" in the Bankruptcy Code occurs in § 109(c)(3), which requires a municipality to be insolvent as a condition of filing a bankruptcy case. The meaning of "insolvency" in this provision is entirely different from the balance sheet test,[4] and is governed by § 101(32)(C), which states that "insolvent" means:

> with reference to a municipality, financial condition such that the municipality is–
>
> (i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or
>
> (ii) unable to pay its debts as they become due . . . .

This is known as the liquidity test for insolvency,[5] and it is the most commonly used definition in the bankruptcy context.[6] This liquidity definition of

---

[4] Section 101(32)(B) also has a different definition of insolvency for a partnership, which is a modified version of the balance sheet test that takes into account the partners' separate assets.

[5] This definition is also used in § 303(h)(1), which authorizes a court to order relief against an involuntary debtor if, "the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute . . . ."

[6] There are other, more sophisticated measures of insolvency that are increasingly used in complex business transactions. *See e.g.*, Michael J. Epstein, *Director/Manager Liability and How to Avoid Furthering Insolvency*,

4

insolvency is the only one that has ever played a role in a debtor's qualifying as a debtor under United States bankruptcy law.[7]

It is not uncommon for debtors to be solvent under the balance sheet test, and yet to have severe financial problems. This court frequently receives cases, filed under both chapter 7 and chapter 11 and especially under chapter 13 (a reorganization chapter for consumers), where the debtor is clearly solvent under a balance sheet test, but has substantial cash flow problems.[8] The United States bankruptcy law is designed to provide relief from creditor pressures for debtors with cash flow difficulties, even where they are clearly solvent under a balance sheet test.

As to reorganizations under chapter 11, there is substantial reason for Congress to decide that a debtor should be eligible before the debtor becomes insolvent under a balance sheet test. The prospects for reorganizing a debtor in financial difficulty are much better when the debtor is still solvent than after it becomes insolvent. If a debtor must wait until it becomes insolvent to invoke the reorganization provisions under the bankruptcy law, substantial economic values will often be irretrievably lost. Congress certainly could legitimately decide that it is best for the economy of the United States to permit solvent debtors to reorganize under the bankruptcy law to preserve economic values.

An additional vice of a balance sheet test as a criterion for admission to the bankruptcy system is that substantial time is consumed in determining whether a debtor is in fact insolvent. This case is illustrative – litigation over the debtors' solvency has consumed a large amount of time and effort, and a determination of the debtors' insolvency has not yet been made more than a year after the filing.

If a reorganization is held up pending a determination of balance sheet insolvency, businesses will rarely be reorganized, and at least some of the reorganization value (the value of a business as reorganized as opposed to its liquidation value) will inevitably be lost. Indeed, this is the experience in countries that require insolvency, according to a balance sheet test, as a condition for admission to the bankruptcy system – businesses are generally not reorganizable, and substantial economic values are lost.[9]

Accordingly, the court finds that the balance sheet test is not the appropriate test for insolvency in evaluating Pierce's constitutional challenge in this case. However, assuming that Pierce has implicitly claimed that the liquidity test should also be applied by the court, the court proceeds to consider Pierce's constitutional challenge.

### B. United States and English Bankruptcy Laws

The United States Congress has enacted five bankruptcy laws.[10] The first was enacted in

---

NABTALK, Summer 2003, at 23, 24. These measures of insolvency have not found their way into United States bankruptcy laws.

[7]The 1898 Act has a similar definition of insolvency. See 1898 Act, § 1(19). Unlike § 101(32)(A) of the Bankruptcy Code, § 1(19) included exempt property in the calculation of insolvency.

[8]Some bankruptcy courts also frequently see chapter 12 cases where the debtor is quite solvent under a balance sheet test. However, chapter 12 cases are rare in the Central District of California.

[9]The World Bank recommends against the use of a balance sheet insolvency test as a qualification for bankruptcy. See Principles and Guidelines for Effective Insolvency and Creditor Rights Systems ¶ 90. Instead, if an insolvency test is to be adopted in a country, the World Bank recommends the liquidity test – the debtor's ability to pay debts as they come due. See id.

[10]At the time of the framing of the Constitution, the terms "bankruptcy" and "insolvency" were applied differently and had operated in different systems. Bankruptcy meant the action against malingering debtors, insolvency relief for the honest but unfortunate debtor. See Sturges v. Crowninshield, 17 U.S. 122, 194-195 (1889) ("But the subject [of bankruptcies] is divisible in its nature into bankrupt and insolvent laws . . . although the two systems have existed apart from each other . . . render it difficult to say how far they may be blended together"); Tabb, at 12; Charles Warren, Bankruptcy in United States History at 7 (1935) (at time of Constitution, only a

1800 ("the 1800 Act"),[11] and was intended to last only five years. *See generally* Charles Jordan Tabb, *The Historical Evolution of the Bankruptcy Discharge,* 65 Am. Bankr. L.J. 325, 344-45 (1991); BRUCE H. MANN, REPUBLIC OF DEBTORS (2002). This act was repealed in 1803. There was no further federal bankruptcy law until 1841 ("the 1841 Act").[12] *See generally* Tabb, *supra,* at 349-51. The 1841 Act lasted for an even shorter time than the 1800 Act, and was repealed in 1843. The next bankruptcy law was enacted in 1867 ("the 1867 Act")[13] to deal with economic dislocations resulting from the Civil War. *See generally* Tabb at 353-55. This law lasted considerably longer than its predecessors, and was repealed in 1878.

Congress enacted permanent federal bankruptcy legislation in 1898 ("the 1898 Act").[14] This law was substantially revised and expanded by the Chandler Act of 1938.[15] It was replaced with the Bankruptcy Code in 1978 (effective October 1, 1979) ("the Bankruptcy Code").[16]

English law has included bankruptcy law continuously since 1542, when Parliament enacted the first bankruptcy law.[17] The next major English bankruptcy law was enacted in 1705.[18] In 1732 Parliament enacted a comprehensive codification and revision of English bankruptcy law,[19] which remained in force (with amendments) at the time that the United States Constitution was written.

### C. The Constitutional Convention

Before examining the English and United States statutes, we turn to the constitutional convention in 1789, to see whether there is anything in the records of the convention that might shed light on the role of insolvency in the meaning of "bankruptcies" in the Bankruptcy Clause.

The Bankruptcy Clause received little discussion in the constitutional convention. The bankruptcy issue arose in a discussion of the Full Faith and Credit clause, and drove the constitutional extension of the Full Faith and Credit clause to acts of the legislature as well as judicial decisions. *See* BRUCE H. MANN, REPUBLIC OF DEBTORS 183 (2002); *see generally id. at* 182-87. Because credit, like commerce, was not limited by state boundaries, the delegates recognized that a national system of bankruptcy law was needed to support a national credit system upon which commerce depended. *See id.* at 185-87.

The only vote against the Bankruptcy Clause was cast by Roger Sherman of Connecticut. He opposed this provision on the grounds that bankruptcies were punishable by death in some cases in England, and he opposed granting Congress this power in the United States. *See Railway Labor Executives' Ass'n v. Gibbons,* 455 U.S. 457, 472 n.13, 102 S.Ct. 1169 (1982), citing 2 M. FARRAND, RECORDS OF THE CONVENTION OF 1787, p. 489 (1911).

The *Federalist Papers,* which discuss in detail virtually every aspect of the Constitution, make only a single reference to the Bankruptcy Clause. In *Federalist No. 42,* James Madison wrote:

> The power of establishing uniform laws of bankruptcy is so intimately connected with the regulation of commerce, and will prevent so many frauds where the parties or their property may

---

few states had laws on either the subject of bankruptcies or insolvency, Pennsylvania being the only state that had both - bankruptcy was releasing traders from debts, insolvency a discharge of all persons from prison upon surrendering their property to their creditors).

[11]Bankruptcy Act of 1800, ch.19, 2 Stat. 19 (1800) (repealed 1803).

[12]Bankruptcy Act of 1841, ch.9, 5 Stat. 440 (1841) (repealed 1843).

[13]Bankruptcy Act of 1867, ch.176, 14 Stat. 517 (1867) (repealed 1878).

[14]Bankruptcy Act of 1898, ch. 541, 30 Stat. 544 (1898) (repealed 1978).

[15]Chandler Act, ch. 575, 52 Stat. 840 (1938) (repealed 1978).

[16]Pub. L. No. 95-598, 92 Stat. 2549 (1978).

[17]An act against such persons as do make bankrupts, 34 & 35 Hen. 8, c.4 (1542).

[18]4 Anne, c. 17 (1705).

[19]5 Geo. 2, c. 30 (1732).

6

> lie or be removed into different States, that the expediency of it seems not likely to be drawn into question.

THE FEDERALIST No. 42, at 239 (James Madison) (Clinton Rossiter ed., 1961).

A few decades later Justice Story (then a professor at Harvard Law School), in his famous *Commentaries*, stated:

> Perhaps, as satisfactory a description of a bankrupt law as can be framed is, that it is a law for the benefit and relief of creditors and their debtors, in cases in which the latter are unable or unwilling to pay their debts. And a law on the subject of bankruptcies, in the sense of the constitution, is a law making provisions for cases of persons failing to pay their debts.

3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1108 n.25. (1833) ("STORY"). In Justice Story's view, it is the failure to pay debts, not insolvency, that distinguishes a debtor who is an eligible subject for bankruptcy relief.[20]

Thus the constitutional history gives no support to the argument that the founders intended that bankruptcy relief be limited to insolvent debtors, or that this meaning was included in the Bankruptcy Clause.

---

[20] *See also* STORY § 1101 ("it may be stated, that the general object of all bankrupt and insolvent laws is, on the one hand, to secure to creditors an appropriation of the property of their debtors *pro tanto* to the discharge of their debts, whenever the latter are unable to discharge the whole amount; and, on the other hand, to relieve unfortunate and honest debtors from perpetual bondage to their creditors, either in the shape of unlimited imprisonment to coerce payment of their debts, or of an absolute right to appropriate and monopolize all their future earnings.")

## D. History of Insolvency Provisions in Bankruptcy Law

Having found the evidence from the constitutional convention unhelpful, we now take a broader look to see what meaning "bankruptcy" was given in relevant legislative enactments on the subject, both before and after the writing of the Constitution. As the Supreme Court has told us, "Probably the most satisfactory approach to the problem of interpretation here involved [the power of Congress under the Bankruptcy Clause] is to examine it in the lights of the acts, and the history of the acts, of Congress which have from time to time been passed on the subject...." *Continental Illinois Nat'l Bank & Trust. v. Chicago, Rock Island & Pac. Ry. Co.*, 294 U.S. 648, 670, 55 S.Ct. 595 (1935).

Historically, bankruptcy laws have not been conceived in the United States or England for the protection of debtors, whether honest or dishonest. Bankruptcy laws were enacted principally for the benefit of trade and for the protection of creditors, to give them more powers acting in concert to collect debts than they possessed individually. *See, e.g.*, 2 WILLIAM BLACKSTONE, COMMENTARIES *472. Indeed, some of the worst abuses were committed by debtors who refused to pay their debts even though they were solvent and eminently capable of paying. The principal benefit to debtors was the avoidance of debtors' prison or the discharge therefrom. *See id.*

An analysis of the history of bankruptcy laws in the United States, and of their predecessors in England, shows that the Bankruptcy Clause has never been tied to balance sheet insolvency, or insolvency of any other type. No United States bankruptcy act, and none of its English predecessors, has ever required balance sheet insolvency as a condition of either voluntary or involuntary bankruptcy. Of the five United States bankruptcy laws and its three principal English predecessors, only the 1841 and the 1867 Acts required a voluntary debtor to plead that the debtor was insolvent in a liquidity sense, i.e. that the debtor was unable to pay his or her debts as they became due, and such a pleading was unchallengeable.

For involuntary bankruptcy cases, insolvency began to creep into United States bankruptcy law in the 1867 Act as an element in

7

one or more "acts of bankruptcy," any one of which would support an involuntary bankruptcy petition. However, only a minority of the acts of bankruptcy included an insolvency element until the Bankruptcy Code, enacted in 1978, under which insolvency is the chief basis for an involuntary petition. Even so, under the Bankruptcy Code the insolvency test for an involuntary petition is a debtor's inability to pay debts as they mature, and not balance sheet insolvency.

### 1. Voluntary Cases

The 1841 Act was the first United States law to authorize a debtor to file a voluntary bankruptcy petition.[21] Neither the 1800 Act nor the English predecessors permitted a voluntary bankruptcy filing. The 1841 Act required that a bankruptcy petition be verified under oath and plead that the debtor is "unable to meet [his or her] debts and engagements . . . ."

This was only a pleading requirement. Neither the parties nor the court had the authority to inquire into whether a debtor was in fact insolvent. *See, e.g., Ex parte Hull*, 12 F. Cas. 853, 856 (S.D.N.Y. 1842). Indeed, the court was required to declare a voluntary petitioner bankrupt on the debtor's sworn representation of inability to pay his or her debts, irrespective of the debtor's actual wealth and financial condition. *See id.*

A debtor filing a voluntary bankruptcy petition under the 1867 Act was similarly required to "set forth . . . his inability to pay all his debts in full . . . ." *See id.* § 11. Immediately upon filing a petition stating the debtor's inability to pay his or her debts in full and the debtor's willingness to surrender his or her estate and effects for the benefit of creditors and a desire to obtain the benefits of the bankruptcy law, the debtor was entitled to be adjudicated a bankrupt. *See, e.g., In re Patterson*, 18 F. Cas. 1315, 1317 (S.D.N.Y. 1867). No further inquiry as to the debtor's ability to pay was permitted. *See id.* at 1318.

The 1898 Act provided that a voluntary debtor could file a bankruptcy case with no requirement of insolvency. *See id.* § 4(a). Unlike the 1841 and 1867 Acts, the 1898 Act did not require a debtor to plead inability to pay his or her debts as they came due. Collier explains § 4(a) as follows:

> A voluntary petitioner may be solvent or insolvent, and his motive is generally immaterial except that the petition may not be filed for purposes of perpetrating a fraud. There is nothing in the Act which requires the person to be insolvent, and there seems to be no reason why, if a solvent person cares to have his property distributed among his creditors through bankruptcy proceedings, he should not be allowed to do so . . . . It will not be necessary to allege insolvency in the petition, nor prove it, to procure an adjudication [of bankruptcy].

1 COLLIER ON BANKRUPTCY ¶ 4.03 (James William Moore, ed., 14th ed. 1976) (interpreting bankruptcy law as it existed before the Bankruptcy Code took effect in 1979). *See also Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 423, 92 S.Ct. 1678 (1972) ("Chapter X proceedings [under the 1898 Act as amended in 1938] are not limited to insolvent corporations but are open to those corporations that are solvent in the bankruptcy (asset-liability) sense but are unable to meet their obligations as they mature"), citing *United States v. Key*, 397 U.S. 322, 329, 90 S.Ct. 1049 (1970).

After arising in the 1841 Act as a pleading requirement, insolvency of any kind disappeared entirely in 1878 (the repeal of the 1867 Act) as a condition of filing a voluntary bankruptcy petition in the United States.

Thus the statutory history shows that no United States bankruptcy law has ever required a voluntary debtor to show that he or she was in fact insolvent, under a balance sheet test or otherwise, as a prerequisite of taking advantage of bankruptcy. While two of the nineteenth century acts required a debtor to plead inability to pay his or her debts as they came due, no creditor was permitted to contest this contention.

---

[21]However, it appears that debtors frequently arranged with friendly creditors to file essentially voluntary bankruptcy cases under the 1800 bankruptcy law. *See* BRUCE H. MANN, A REPUBLIC OF DEBTORS 228-39 (2002).

8

## 2. Involuntary Cases

Similarly, insolvency has never been a condition for a debtor to become an involuntary bankrupt, either under United States bankruptcy law or under its English predecessors.

The English bankruptcy laws prior to the United States revolution uniformly provided only for involuntary bankruptcy. Uniformly, also, these laws made no provision for insolvency as a condition of the filing of a petition in bankruptcy against a debtor. Instead, these statutes based the right to file an involuntary bankruptcy petition on what became known as a debtor's "acts of bankruptcy." Any single act of bankruptcy, under each of these laws, was sufficient to support an involuntary bankruptcy petition. The qualifying acts included such conduct as refusing to pay creditors, departing the country, staying in one's house (to avoid service of process), taking sanctuary, and permitting himself or herself to be arrested (presumably for not paying debts). In addition, the creditor was required to show that the debtor took such an action with the intent to hinder or delay his or her creditors.

Blackstone's *Commentaries on the Laws of England*, published in 1765 to 1769, are in accord with the English laws. Blackstone wrote extensively in his *Commentaries* about bankruptcy law. However, like the English bankruptcy law of his time, Blackstone makes no reference to insolvency as a qualification for bankruptcy. *See* 2 WILLIAM BLACKSTONE, COMMENTARIES *471-88.

Blackstone's *Commentaries* were well known to the writers of the Constitution and to early United States judges and lawyers. *See Hanover Nat. Bank v. Moyses*, 186 U.S. 181, 187 (1902) and sources cited therein; *Nelson v. Carland*, 42 U.S. (1 How.) 265, 270-73 (1843) (dissenting opinion of Justice Catron).

In the United States, the first two bankruptcy acts, the 1800 Act and 1841 Act permitted a creditor to file an involuntary bankruptcy petition against a debtor only if the debtor had committed an act of bankruptcy that did not involve the debtor's insolvency. The 1800 Act specified ten qualifying acts of bankruptcy, which largely mirrored those in the English statutes. *See* 1800 Act, § 1. The 1841 Act reduced to five the qualifying acts of bankruptcy. *See* 1841 Act, § 1. Like their predecessor English laws, none of the qualifying acts of bankruptcy in either the 1800 or the 1841 Acts included insolvency as an element or factor to be considered in making an adjudication of bankruptcy.

The Act of 1867 was the first to introduce insolvency as an element in any of the acts of bankruptcy that may support an involuntary bankruptcy petition. Of the nine statutory acts of insolvency[22] that could support an involuntary petition under the 1867 Act, one was the granting of a preferential transfer, "being bankrupt or insolvent, or in contemplation of bankruptcy or insolvency . . . . ." *See* 1867 Act, § 39. None of the other acts of bankruptcy in the 1867 Act involved the insolvency of the debtor.

It is only in the 1898 Act that insolvency took a prominent role in the acts of bankruptcy that could support an involuntary petition. *See* 1898 Act, § 3. Among the reduced list of four acts of bankruptcy in the original statute, three involved the debtor's insolvency. One such act of bankruptcy under the 1898 Act was the preferential transfer, brought forward from the Act of 1867. A second act of bankruptcy involving the debtor's insolvency in the 1898 Act was admitting in writing the inability to pay debts as they matured and being willing to be adjudged a bankrupt. In a third act of bankruptcy, making a fraudulent transfer, the debtor was given an affirmative defense of solvency.[23] Congress added a fourth act of bankruptcy involving insolvency in 1903: having a receiver or trustee take charge of the debtor's property while the debtor was insolvent or unable to pay debts as they matured. In 1926, Congress added yet a fifth act of bankruptcy involving the debtor's insolvency to the 1898 Act: suffering, while insolvent, a lien that was not vacated or discharged within thirty days after the lien was obtained. Throughout the career of the 1898 Act (through September 30, 1979), making a general assignment for the benefit of creditors was an act of bankruptcy that did not require the insolvency of the debtor.

The Bankruptcy Code, while reducing to

---

[22]Case law under the 1867 Act treated a general assignment for the benefit of creditors as a tenth act of bankruptcy. *See Boese v. King*, 108 U.S. 379, 385, 2 S.Ct. 765 (1883). This act of bankruptcy also did not require the debtor's insolvency.

[23]*See id.* § 3(c).

9

two the acts of bankruptcy that can support an involuntary petition, continues to permit an involuntary bankruptcy notwithstanding a debtor's solvency. The code permits a court to order relief against the debtor if, within 120 days of the filing of the petition, a custodian, receiver or agent is appointed or takes possession of less than substantially all of the debtor's property to enforce a lien. *See* § 303(h)(2).

However, virtually every involuntary petition filed under the Bankruptcy Code relies on § 303(h)(1),[24] which authorizes an involuntary case where the debtor "is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute . . . ." Thus insolvency is now a major factor in an involuntary bankruptcy case. However, it is the liquidity definition of insolvency that controls, and not the balance sheet definition on which Pierce relies.

The court concludes from the foregoing history that, at the time that the Constitution was written, insolvency of any kind as a condition for bankruptcy was utterly unknown. Thus it is not credible that the framers of the Constitution thought that a requirement of insolvency was included in the concept of bankruptcy that found its way into the Bankruptcy Clause. Furthermore, insolvency has never been a statutory requirement for either voluntary or involuntary bankruptcy under United States. However, beginning with the 1898 Act, liquidity insolvency has become largely a requirement for an involuntary bankruptcy case.

### E. Watershed Developments in Bankruptcy Concepts

The development of bankruptcy law did not end with the writing of the Bankruptcy Clause in the United States Constitution in 1787. There are three watershed developments in United States bankruptcy law since that date.

The first major development, which was introduced in the 1841 Act, was the authorization for a debtor to file a voluntary bankruptcy case without waiting for a creditor to file an involuntary petition against the debtor. Justice Catron, sitting on circuit in the district of Missouri, found this provision constitutional in *In re Klein*, 14 F. Cas. 716, 718 (1843), reported in a note to *Nelson v. Carland*, 42 U.S. (1 How.) 265, 277 (1843). The Supreme Court cited *Klein* with approval on this issue in *Hanover Nat. Bank v. Moyses*, 186 U.S. 181, 186 (1902).

The landmark major development, also adopted in the 1841 Act, was the extension of the bankruptcy law to individuals who are not traders. The Supreme Court approved this development also in *Moyses*, 186 U.S. at 186, again relying on *Klein*.

The third major landmark was the addition of reorganization as a mode of bankruptcy authorized under the Bankruptcy Clause. This first reorganization provision appeared in United States law in the Act of March 3, 1933, which was signed by President Hoover on his last day in office.[25] The Supreme Court validated the constitutionality of reorganization under the Bankruptcy Clause in *Continental Illinois Nat. Bank & Trust Co. v. Chicago, R.I. & P. Ry.*, 294 U.S. 648, 668, 55 S.Ct. 595 (1935) (railroad reorganization under § 77 of the 1898 Act as amended in 1933); *accord, United States v. Bekins (In re Lindsay-Strathmore Irrigation Dist.)*, 304 U.S. 27, 47, 58 S.Ct. 811 (1938).

Each of these provisions constituted a landmark change in bankruptcy law from that known in 1787 when the Bankruptcy Clause was written into the Constitution. In the words of the Supreme Court itself, these extensions of bankruptcy law were of a "fundamental and radically progressive nature." *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 588, 55 S.Ct. 854 (1935), quoting *Continental Illinois*, 294 U.S. at 671. Nonetheless, the Supreme Court found that each of these developments comes within the ambit of the Bankruptcy Power, and thus is constitutional. *Radford*, 295 U.S. at 587-88; *Continental Illinois*, 294 U.S. at 671.

More generally, the Supreme Court has very recently stated that the Constitution should not be restricted to a particular generation's

---

[24] As a bankruptcy judge for nearly twenty years, I have handled nearly a hundred thousand bankruptcy cases. Perhaps two hundred of these cases have commenced with involuntary bankruptcy petitions. I can recall only one that probably was based on § 303(h)(2).

[25] The various reorganization provisions enacted over several years beginning in 1933 were substantially revised in the Chandler Act of 1938.

interpretation of the Constitution: "As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom." *Lawrence v. Texas*, ___ U.S. ___, 123 S.Ct. 2472, 2484 (2003) (finding due process violation in Texas statute prohibiting same-sex sodomy).

In contrast to these landmark bankruptcy law changes, the filing of a bankruptcy case by or with respect to a solvent debtor has always been permitted under bankruptcy law, both under every bankruptcy law enacted in the United States and under every prior law enacted in England.

### F. Supreme Court Case Law

Supreme Court case law likewise gives no support to the thesis that, as a constitutional matter, congressional power to provide bankruptcy protection must be limited to those who are insolvent, whether under a balance sheet test or otherwise.[26] Even if the English bankruptcy law in effect in 1787 had limited bankruptcy to debtors who satisfied an insolvency test, this would not be determinative in this case more than two centuries later.

#### 1. Expansive Supreme Court Statements

The United States Supreme Court has consistently taken an expansive view of the Bankruptcy Powers, to permit their application in the context of the enormous expansion of the economy since 1787 and the correspondingly great elaboration of the legal structures supporting it:

> [T]he notion that the framers of the Constitution, by the bankruptcy clause, intended to limit the power of Congress to the then existing English law and practice upon the subject long since has been dispelled. . . . Whether a clause in the Constitution is to be restricted by the rules of the English law as they existed when the Constitution was adopted depends upon the terms or the nature of the particular clause in question.

*Continental Illinois Nat. Bank & Trust Co. v. Chicago, R.I. & P. Ry.*, 294 U.S. 648, 668 (1935). The Supreme Court has repeatedly and consistently held that the Bankruptcy Powers are not limited to the meaning of the term "bankruptcy" at the time of the formulation of the Constitution. *See, e.g., Wright v. Union Central Life Ins. Co.*, 304 U.S. 502 (1938); *Adair v. Bank of America NTSA*, 303 U.S. 350, 354, 58 S.Ct. 594 (1938); *Hanover National Bank of the City of New York v. Moyses*, 186 U.S. 181, 187 (1902) ("The framers of the Constitution were familiar with Blackstone's Commentaries, and with the bankrupt laws of England, yet they granted plenary power to Congress over the whole subject of 'bankruptcies,' and did not limit it by the language [that they] used.")

The core of the federal bankruptcy power, according to the Supreme Court, is "the restructuring of debtor-creditor relations . . . ." *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71, 102 S.Ct. 2858 (1982) (plurality opinion). Beyond this core, as a general rule, the Supreme Court has said, "the subject of bankruptcies is incapable of final definition." *Railway Labor Executives' Ass'n v. Gibbons*, 455 U.S. 457, 466 (1982); *accord, Wright v. Union Central*, 304 U.S. at 513; *Continental Illinois*, 294 U.S. at 669-70 ("[t]hose limitations have never been explicitly defined, and any attempt to do so now would result in little more than a paraphrase of the language of the Constitution without advancing far toward its full meaning.)" In *Gibbons* the Supreme Court stated:

> [W]e have previously defined "bankruptcy" as the subject of the relations between an *insolvent or nonpaying or fraudulent debtor* and his creditors, extending to his and their relief. Congress' power under the Bankruptcy Clause contemplates an adjustment of a failing debtor's obligations. This

---

[26]The court has found no relevant case law from the Ninth Circuit or the Ninth Circuit Bankruptcy Appellate Panel.

11

power extends to all cases where the law causes to be distributed, the property of the debtor among his creditors. It includes the power to discharge the debtor from his contracts and legal liabilities, as well as to distribute his property. The grant to Congress involves the power to impair the obligation of contracts, and this the States were forbidden to do.

455 U.S. at 466 (emphasis added, quotations and citations omitted).

In *Moyses*, the Court added that the debtor "may be, in fact, fraudulent, and able and unwilling to pay his debts; but the law takes him at his word, and makes effectual provision, not only by civil, but even by criminal, process, to effectuate his alleged intent of giving up all his property." *Id.* Thus the "subject of bankruptcies" includes the power to discharge a debtor from contracts and legal liabilities, and to distribute the debtor's property to creditors. *Id.* at 188 (upholding the constitutionality of the Bankruptcy Act of 1898 insofar as it authorized the discharge of a judgment on a promissory note). The Court in *Moyses* also stated: "all intermediate legislation, affecting substance and form, but tending to further the great end of the subject, – distribution and discharge, – are in the competency and discretion of Congress." *Id.* at 186, quoting *In re Klein*, 14 F. Cas. No. 716 (D. Mo. 1843), reprinted in a note to *Nelson v. Carland*, 42 U.S. (1 How.) 265, 277, 11 L.Ed. 126, 130 (1843).

The Court further stated in *Continental Illinois Nat. Bank & Trust Co. v. Chicago, R.I. & P. Ry.*, 294 U.S. 648, 668 (1935), that bankruptcy "may be construed to include a debtor who, although unable to pay promptly, may be able to pay if time to do so be sufficiently extended," i.e., a solvent debtor. There is no reason to believe that the bankruptcy laws of the nineteenth century exhausted congressional power under the Bankruptcy Clause

The Supreme Court has also spoken on the essential purposes of chapter 11, under which the debtors filed this case. In *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 527, 104 S.Ct. 1188 (1984), the Court stated that the policy of chapter 11 is to permit the successful rehabilitation of debtors. The Court elaborated this policy in *Toibb v. Ratloff*, 501 U.S. 157, 111 S.Ct. 2197 (1991), to state that one Congressional purpose of chapter 11 is "permitting business debtors to reorganize and restructure their debts in order to revive the debtors' businesses and thereby preserve jobs and protect investors." *Id.* at 163. In addition, the Court said in that case:

> Chapter 11 also embodies the general Code policy of maximizing the value of the bankruptcy estate. Under certain circumstances a consumer debtor's estate will be worth more if reorganized under Chapter 11 than if liquidated under Chapter 7. Allowing such a debtor to proceed under Chapter 11 serves the congressional purpose of deriving as much value as possible from the debtor's estate.

*Id.* The Court used this rationale in *Toibb* to hold that individual consumers, like the debtors in this case, are entitled to take advantage of chapter 11 to reorganize their financial affairs, even though they may have no business to reorganize. *See id.* at 160-66.

Similarly, in *Bank of America NTSA v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 119 S.Ct. 1411 (1999, the Court stated that, "the two recognized policies underlying Chapter 11 [are] preserving going concerns and maximizing property available to satisfy creditors . . . ." *Id.* at 453.

The debtors in this case at least qualify as "nonpaying" debtors, in the terminology of *Gibbons*, and they certainly appeared to be failing when they filed their case. If they enjoy a bonanza from their chapter 11 plan, it will result from Pierce's refusal to file a claim on his $12 million Texas judgment.

Furthermore, the court finds that the chapter 11 plan in this case maximizes the property available to satisfy creditors. At the time of filing, it was not at all clear that the debtors could pay their creditors in full. The plan settles this issue.

12

**2. Cases Finding Bankruptcy Provisions Unconstitutional**

There are very few Supreme Court cases holding that Congress has exceeded its constitutional powers in legislating on the subject of bankruptcy. In light of the foregoing expansive descriptions of Congress' powers under the Bankruptcy Clause, these cases shed little light on any relevant limitations on Congress' Bankruptcy Powers.

Perhaps the best known case holding unconstitutional a provision of bankruptcy law is *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935), which invalidated the Frazier-Lemke addition to the 1898 Act that permitted a farmer to pay rent instead of mortgage payments for five years and then retire the mortgage by paying only the (likely reduced) fair market value of the property. The principal vice of this provision, the Supreme Court found, was that Congress applied it only to mortgages existing on the date of enactment, and thus it constituted a taking of existing property rights of mortgage holders in violation of the Just Compensation clause of the Fifth Amendment.[27] *See id.* at 589-602.

In *Railway Labor Executives' Ass'n v. Gibbons*, 455 U.S. 457, 469-73 (1982), the Supreme Court held that bankruptcy legislation explicitly applying to a single (albeit large) debtor, and no other similarly situated debtors, unconstitutionally violated the uniformity requirement of the Bankruptcy Clause. A bankruptcy law, the Supreme Court held, must at least apply uniformly to a defined class of debtors. *See id.* at 473. *But see Regional Rail Reorganization Cases*, 419 U.S. 102, 158-60, 95 S.Ct. 335 (1974) (holding that bankruptcy statute governing railroad reorganization in one region did not violate Uniformity Clause when no railroad reorganization was pending outside that region). Similarly, the Ninth Circuit has held that § 317(a) of the Judicial Improvements Act of 1990, which authorizes bankruptcy administrators (employed by the judicial branch) to substitute for United States Trustees (employed in the Department of Justice) in two states alone (North Carolina and Alabama) violates the Uniformity Clause. *See St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525, 1531-32 (9th Cir. 1994).

In *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 109 S.Ct. 2782 (1989), the Supreme Court held that the bankruptcy power did not permit Congress to eliminate a party's Seventh Amendment jury trial right by relabeling the cause of action and assigning it to a specialized court in equity. *Id.* at 61. Also well known is *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858 (1982), where the Supreme Court found that the Bankruptcy Clause did not authorize Congress to grant bankruptcy jurisdiction to courts lacking Article III tenure.

There are also very few lower court decisions finding a bankruptcy law provision unconstitutional. There is one contemporary example. A battle rages among lower courts today on whether rights clearly legislated under the Bankruptcy Clause can be enforced under § 105(a) in federal court against state governments in light of the Eleventh Amendment (constitutionalizing state sovereign immunity) and case law thereunder. In *Hood v. Tennessee Student Assistance Corp. (In re Hood)*, 319 F.3d 755, 761-68 (6th Cir. 2003), the Sixth Circuit held that the Bankruptcy Clause authorized Congress, notwithstanding the Eleventh Amendment, to abrogate state sovereign immunity in bankruptcy matters. In contrast, the following circuit court decisions have held that the Eleventh Amendment prevents Congress from abrogating state sovereign immunity in bankruptcy matters: *Nelson v. La Crosse County Dist. Attorney (In re Nelson)*, 301 F.3d 820, 832 (7th Cir. 2002); *Mitchell v. Franchise Tax Bd. (In re Mitchell)*, 209 F.3d 1111,

---

[27] *See also United States v. Security Industrial Bank*, 459 U.S. 70, 103 S.Ct. 407 (1982), where the Supreme Court construed narrowly the provision in § 522(f), that permits a debtor to avoid the fixing of a lien on an interest of the debtor in property, to the extent that the lien impairs an exemption. The Court held that, to avoid a likely violation of the Just Compensation Clause of the Fifth Amendment, this provision must not permit the avoidance of liens existing before its enactment. *See id.* at 82. In contrast, the Ninth Circuit held in *Webber v. Credithrift (In re Webber)*, 674 F.2d 796 (9th Cir. 1982), that a debtor may take advantage of § 522(f) to avoid the fixing of a lien on an interest in property that impaired an exemption, where the lien was fixed before the effective date of the Bankruptcy Code (and § 522(f)) but after its enactment. *See id.* at 803-04.

13

1121 (9th Cir. 2000); *Sacred Heart Hosp. v. Pennsylvania (In re Sacred Heart Hosp.)*, 133 F.3d 237, 243 (3d Cir.1998); *Fernandez v. PNL Asset Mgmt. Co. LLC (In re Fernandez)*, 123 F.3d 241, 243 (5th Cir.), amended by 130 F.3d 1138, 1139 (5th Cir.1997); *Schlossberg v. Maryland (In re Creative Goldsmiths)*, 119 F.3d 1140, 1145-46 (4th Cir.1997).

This case today does not require the court to determine the limits of the Bankruptcy Powers granted to the federal government in the Constitution. Accordingly, the court leaves this issue to another day.

### G. Substantive Due Process

Pierce contends that Howard's bankruptcy case deprives him of his substantive due process rights, thereby invoking "dormant" substantive economic due process rights that have disappeared from Supreme Court jurisprudence since the 1930's. The Fifth Amendment provides in relevant part, "nor shall any person . . . be deprived of life, liberty or property, without due process of law . . . ." Under this theory, the Fifth Amendment is a limitation on the scope of "the subject of bankruptcies."

Recent Supreme Court decisions make it clear that substantive due process is alive and well in its jurisprudence, insofar as it concerns individual rights and liberties. *See, e.g., Lawrence v. Texas*, ___ U.S. ___, 123 S.Ct. 2472, 2484 (2003) (finding due process violation in Texas statute prohibiting same-sex sodomy). In contrast, substantive economic due process remains sound asleep in Supreme Court jurisprudence. Thus, entirely apart from the particular controversy before this court, Pierce faces a steep uphill climb to invoke substantive economic due process.

Apparently the only Supreme Court case addressing substantive due process rights in the bankruptcy context is *Canada Southern Ry. v. Gebhard*, 109 U.S. 527, 3 S.Ct. 363 (1883), where New York bondholders challenged a Canadian railroad "scheme of arrangement" specially authorized by Canadian statute. The bondholders had not participated in the Canadian proceeding. The Court found that the scheme was "no more than is done in bankruptcy" in the United States, and thus that the scheme should be enforced in a United States court against all creditors. *See id.* at 537-40. Thus the Supreme Court rejected the substantive due process challenge to the arrangement. *See id.* at 537.

Procedural due process rights under the Fifth Amendment clearly apply in the bankruptcy context. In *Hanover Nat. Bank v. Moyses*, 186 U.S. 181, 187, 22 S.Ct. 857 (1902), for example, the Supreme Court found that the notice requirements of the Fifth Amendment Due Process Clause applied and were satisfied. The Court rejected the contention that personal notice of the filing was required. The Court found that bankruptcy proceedings are, generally speaking, in the nature of proceedings *in rem*, for which notice by publication and mail satisfy due process requirements. Pierce does not complain of procedural due process violations in this case.

The court finds it unnecessary to explore in detail the constitutional consequences of bankruptcy legislation that falls outside the Bankruptcy Powers of the Constitution. If this case were to fall outside the scope of the Bankruptcy Clause, the court assumes without deciding that the law would violate some constitutional provision. However, the court does not reach this issue because the court finds that Congress has the power under the Bankruptcy Clause to determine that a debtor may invoke rights under the Bankruptcy Code to adjust obligations with creditors before the debtor becomes insolvent under a balance sheet test.

The larger constitutional issue concerns the power to extinguish debts and cancel contractual obligations. Under the Articles of Confederation, the states possessed and used this power, to the consternation of many. *See* Alexander Hamilton, Federalist No. 85, praising the new constitution's "precautions against the repetition of those practices on the part of the State governments which have undermined the foundations of property and credit, have planted mutual distrust in the breasts of all classes of citizens, and have occasioned an almost universal prostration of morals." The states, because they were sovereign, possessed broad power to discharge debts and contractual obligations.

What has happened to this power? The grand bargain of 1787 was that states surrendered it to the new federal government in exchange for the checks and balances of a federal system that would restrain the new national legislature from unwise debt forgiveness. *Moyses*, 186 U.S. at 187.

Thus, the grant of power to Congress over the "subject of bankruptcies" in Article I, Section 8 is balanced with the prohibition in Article I, Section 10, forbidding states from impairing the obligation of contracts. The power to discharge debts and contractual obligations was not extinguished: it was surrendered to the federal government. *See id.*

There is a significant difference, with respect to the Bankruptcy Power, between property interests and contract rights. *See Webber v. Credithrift (In re Webber)*, 674 F.2d 796, 802 (9th Cir. 1982). In the bankruptcy context, property rights enjoy at least a measure of protection under the Due Process and Just Compensation Clauses of the Fifth Amendment. *See, e.g., Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 55 S.Ct. 854 (1935) (just compensation); *United States v. Security Industrial Bank*, 459 U.S. 70, 103 S.Ct. 407 (1982) (same). On the other hand, Congress is not prohibited from passing laws that impair the obligation of contracts. *See, e.g., Continental Bank v. Rock Island Ry.*, 294 U.S. 648, 680, 55 S.Ct. 595 (1935); *Webber*, 674 F.2d at 802. "In fact, the very essence of bankruptcy laws is the modification or impairment of contractual obligations." *Webber*, 674 F.2d at 802.

The protection of property rights in the bankruptcy context, however, is measured. The Supreme Court made this clear in *Wright v. Union Central Life Ins. Co.*, 304 U.S. 502, 58 S.Ct. 1025 (1938):

> Property rights do not gain any absolute inviolability in the bankruptcy court because created and protected by state law. Most property rights are so created and protected. But if Congress is acting within its bankruptcy power, it may authorize the bankruptcy court to affect these property rights, provided the limitations of the due process clause are observed.

*See id.* at 518.

In this case, Pierce has neither property rights nor contract rights to assert against the debtors. He does not even have a claim against the debtors in this case, because he refused to file his claim. He has only a Texas state court judgment that is on appeal. This claim is in danger of discharge if the debtors' chapter 11 plan is confirmed. The court finds that this is an insufficient basis to find a violation of Pierce's Fifth Amendment economic substantive due process rights in this case.

### IV. Conclusion

The court concludes that Pierce's constitutional challenge to the debtors' bankruptcy case and their plan of reorganization under chapter 11 cannot be sustained. The court finds that Congress may validly exercise the Bankruptcy Powers under the Constitution to authorize the filing of a chapter 11 case and to confirm a plan of reorganization by a debtor who is solvent, whether in the balance sheet sense or in the liquidity sense.

The court has previously found against Pierce on his statutory objections to the chapter 11 plan and on his motion to dismiss based on bad faith. Accordingly, the court finds that the chapter 11 plan should be confirmed and the motion to dismiss should be denied.

Dated: September 3, 2003

*/s/ Samuel L. Bufford*
Samuel L. Bufford
United States Bankruptcy Judge

15

## CERTIIFICATE OF MAILING

I certify that a true copy of this AMENDED OPINION ON PLAN CONFIRMATION AND MOTION TO DISMISS (CONSTITUTIONAL ISSUES) was mailed on ___SEP 0 4 2003___ to the parties listed below:

U.S. Trustee Office
Ernst & Young Plaza
725 S. Figueroa St., 26th Floor
Los Angeles, CA 90017

Chambers Law Firm
Jeffrey W. Chambers
6440 N. Central Expressway, Ste. 416
Dallas, TX 75206

J. Howard Marshall, III
Ilene Marshall
300 S. Orange Grove Blvd., #7
Pasadena, CA 91105

David L. Neale/Anne E. Wells
Levene Neale Bender Rankin et al.
1801 Avenue of the Stars, Ste. 1120
Los Angeles, CA 90067

Bingham McCutchen, LLP
Julia Frost-Davies
Rheba Rutkowski
Andrew J. Gallo
150 Federal Street
Boston, MA 02110

Bank of America
P. O. Box 35140
Louisville, KY 40232-5140

Mellon Bank, N.A.
2 Mellon Bank Center, Room 875
Pittsburgh, PA 15259

Bingham McCutchen, LLP
G. Eric Brunstad, Jr.
One State Street
Hartford, CT 06103-3178

Charles W. Fish
Charles Fish Investments, Inc.
20 Corporate Park, Ste. 400
Irvine, CA 92606

Bingham McClutchen, LLP
Matthew A. Lesnick
355 S. Grand Ave., Ste. 4400
Los Angeles, CA 90071-6400

Jean Morris, Esq.
Greenberg Glusker Fields Claman
Machtinger & Kisclla
1245 West Highway 246
Buelton, CA 93427

Robert DeChristofaro, VP
Boston Safe Deposit & Trust Company
One Boston Place
Boston, MA 02108

DATED: ___SEP 0 4 2003___

_/s/ Denise O'Quin_
Deputy Clerk